Hillsborough-southern judicial district
No. 2004-510

## THE STATE OF NEW HAMPSHIRE

v.

## DANIEL AYER, SR.

Argued: September 27, 2006
Opinion Issued: December 7, 2006

502

*Kelly A. Ayotte,* attorney general (*Simon R. Brown,* senior assistant attorney general, on the brief and orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

Daniel E. Ayer, Sr., by brief, *pro se.*

GALWAY, J. The defendant, Daniel Ayer, Sr., appeals his conviction for first-degree murder, *see* RSA 630:1-a, following a jury trial in Superior Court (*Hampsey,* J.). We affirm.

The jury could have found the following facts. Beginning in 1998, the New Hampshire Division for Children, Youth and Families (DCYF) became involved with the defendant's family, and in July 1999, Family Counselor Mark Rowland of the Nashua Children's Home was assigned to

the defendant's case. On August 20, 1999, Rowland was scheduled to meet with the defendant's family. When Rowland arrived that day, the defendant was leaving in his truck. He informed Rowland that he did not want to meet and that he hoped Rowland would leave. The defendant then left the property but remained in the immediate area. Rowland did not leave. When the defendant returned a few minutes later, Rowland told the defendant that he would not leave. The defendant then shot Rowland in the head and fled in his truck. Rowland later died from the gunshot wound.

Within minutes of the shooting, Officer Martin Matthews of the Nashua Police Department received a radio dispatch about the shooting and rushed to the scene. Immediately after he arrived, emergency medical personnel arrived and began treating Rowland. As soon as the scene was secured, Matthews was ordered to begin investigating this urgent situation. He scanned the area for potential witnesses to the shooting and for anyone who might know where the shooter was. His attention was drawn to a woman, later identified as Joan Ayer, the defendant's wife, who was standing near the scene, crying hysterically. As Matthews approached Mrs. Ayer, but before he asked any questions, she blurted out, "He had said that morning that he was going to shoot him," and, "he'd been sitting across the street in his truck all morning waiting for him." Matthews asked to whom Mrs. Ayer was referring and she responded that it was her husband. When asked who her husband was, Mrs. Ayer identified the defendant. She then described the defendant's truck and informed Matthews that the defendant had access to firearms.

Matthews conveyed Mrs. Ayer's description of the defendant's vehicle to his dispatcher, who then issued an alert to other officers. Shortly thereafter, Officers Matthew Eskridge and Scott Anderson saw the defendant's truck. The officers stopped the truck and arrested the defendant without incident. While arresting the defendant, the officers noticed firearms and ammunition in his truck. One of the firearms was later determined to be the murder weapon. The defendant was transported to the Nashua Police Department for booking. Approximately forty minutes elapsed from the time the original dispatch was sent until the defendant was booked at the police station.

At the police station, the defendant waived his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and gave a formal statement to police. He stated that he felt he had been harassed by DCYF and other agencies for some time and that when Rowland arrived at his home and would not leave, he "snapped." He also stated that he had been contemplating making a "demonstration" for some time and that a "demonstration" was necessary to make DCYF and others heed his complaints and concerns.

In 2003, the defendant was convicted of first-degree murder. That conviction was reversed on appeal. *See State v. Ayer*, 150 N.H. 14 (2003). Upon retrial, the defendant was again convicted of first-degree murder. This appeal followed.

On appeal, the defendant argues that the trial court erred by: (1) permitting the State to introduce Mrs. Ayer's statements to Officer Matthews; (2) permitting the State to introduce evidence of the firearms and ammunition found in his truck; (3) failing to allow him to present evidence on, and have jury instructions regarding, certain defenses and lesser offenses; (4) appointing counsel for him when he desired to proceed *pro se*; (5) partially denying a motion to suppress and failing to find that he invoked his right to counsel during booking; (6) only partially suppressing his statement to Nashua police officers; and (7) denying pretrial motions to suppress regarding items seized from his truck as the fruits of unlawfully obtained statements. We address each argument in turn.

## I. Mrs. Ayer's Statements to Officer Matthews

The defendant first argues, based upon *Crawford v. Washington*, 541 U.S. 36 (2004), that because Mrs. Ayer did not testify at his trial, the State should not have been permitted to introduce her statements to Officer Matthews. The defendant contends that admitting Mrs. Ayer's statements violated his right to confrontation under the New Hampshire and United States Constitutions. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. VI, XIV. Because the defendant has raised his claim under the State and Federal Constitutions, we would normally address his State claim first. *See State v. Dedrick*, 132 N.H. 218, 226 (1989). However, in this case, the defendant has raised an issue under the Federal Constitution and has not enunciated either a State standard different from the Federal one or a reason to adopt such a standard; we will therefore address his claim under the Federal Constitution first. *Id.*

In *Crawford*, the defendant was arrested for stabbing a man who, he claimed, attempted to rape his wife. *Crawford*, 541 U.S. at 38. The defendant's wife was interrogated at the police station, and gave a taped statement about the incident. *Id.* at 38-39. At trial, the defendant's wife did not testify. *Id.* at 40. The State, therefore, sought to introduce her tape-recorded statement. *Id.* The defendant objected on the ground that introducing the tape would violate his Sixth Amendment right to confrontation. *Id.*

In ruling that the admission of the taped statement violated the "Sixth Amendment's guarantee that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him", *id.* at 38 (quotations and ellipsis omitted), the Court overruled, in part, a line

of cases beginning with *Ohio v. Roberts*, 448 U.S. 56 (1980). Under the *Roberts* analysis, certain out-of-court statements could be admitted if the declarant was unavailable and the statements fell within a "firmly rooted" exception to the rule against hearsay, or if they bore particularized guarantees of trustworthiness. *Roberts*, 448 U.S. at 66. In rejecting the *Roberts* formulation as it pertained to testimonial statements, the Court stated, "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Crawford*, 541 U.S. at 61. Accordingly, the Court ruled that testimonial statements of a declarant absent from trial would only be admitted when the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Id.* at 59. The Court did not alter the *Roberts* analysis pertaining to the admissibility of nontestimonial statements. *See, e.g., Horton v. Allen*, 370 F.3d 75, 84 (1st Cir. 2004) ("[U]nless [the] statements qualify as 'testimonial,' *Crawford* is inapplicable and *Roberts* continues to apply.").

■ Under *Crawford*, "a declarant's 'testimonial' out-of-court statement is not admissible under the Confrontation Clause unless (1) the declarant testifies, or (2) the defendant had a prior opportunity for cross-examination and the declarant is unavailable, or (3) the evidence is admitted for purposes other than establishing the truth of the matter asserted." *United States v. Maher*, 454 F.3d 13, 19-20 (1st Cir. 2005). Therefore, "[a]ssuming the declarant does not testify and is in fact available, and/or there was no prior opportunity for cross-examination of the declarant, *Crawford* claims will usually turn on one of two issues. First, was the out-of-court statement testimonial? Second, if so, is it admissible for reasons other than the truth of the matter asserted?" *Id.* at 20. Resolution of the matter before us turns on the first issue.

In *Crawford*, the Supreme Court did not define what statements qualify as testimonial. *Crawford*, 541 U.S. at 68. Instead, the Court listed, for illustrative purposes, various types of statements that fall within the "core class" of testimonial statements. With only the Supreme Court's illustrations to guide them, however, state and federal courts developed numerous, and often conflicting, analyses for determining which evidence is testimonial and therefore subject to *Crawford*. *See, e.g., Flores v. State*, 120 P.3d 1170, 1177 (Nev. 2005). Recently, in *Davis v. Washington*, 126 S. Ct. 2266 (2006), the Supreme Court clarified the definition of testimonial statements.

*Davis* involved two consolidated cases. In the first, *Davis v. Washington*, a woman made a 911 call during the course of a domestic

disturbance with her former boyfriend. *Id.* at 2270-71. The victim gave numerous statements to the 911 operator about her assailant during and immediately after the assault. *Id.* at 2271. When police arrived a few minutes later, they observed the victim's shaken state, her fresh injuries and her frantic efforts to collect her belongings in order to leave. *Id.* When her attacker, Davis, was tried for the assault, the victim did not testify and the State sought to introduce her statements to the 911 operator. *Id.* The Supreme Court of Washington held that some of the statements to the 911 operator were nontestimonial and thus not barred by *Crawford,* and that admitting any statements which were testimonial was harmless. *Id.* at 2271-72.

In the second case, *Hammon v. Indiana,* police responded to a report of a domestic disturbance. *Id.* at 2272. Upon arriving, the police found a woman, Amy, sitting on the front porch of her home. *Id.* She informed the police that nothing was wrong, but that they could, nonetheless, enter. *Id.* Once inside, the police noticed signs of a physical altercation and sought to question Amy as well as a man found inside, the defendant. *Id.* The police took the two people into separate rooms and questioned them about what had happened. *Id.* After hearing Amy's account of how the defendant had attacked her, the police had her fill out a "battery affidavit." *Id.* At the defendant's trial, Amy did not appear and the State, over the defendant's objection, introduced her oral statements to the officers and her statements in the battery affidavit. *Id.* The Indiana Supreme Court held that her oral statements were admissible as excited utterances and were not testimonial so as to be barred by *Crawford. Id.* at 2273. The Indiana Supreme Court found that the battery affidavit was testimonial, but that its admission was harmless. *Id.*

 In addressing these cases, the United States Supreme Court noted that "[a] critical portion of th[e] holding [in *Crawford*], and the portion central to resolution of the two cases now before us, is the phrase 'testimonial statements'" because "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Id.* Accordingly, the Court stated:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial

when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* The Court made sure "not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 2274 n. 1. This is so because "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." *Id.* Thus, "even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." *Id.*

Applying its new definition of testimonial statements to the facts of *Davis*, the Supreme Court held that the victim's statements to the 911 operator were nontestimonial. *Id.* at 2276-77. The Court noted that the victim was speaking about events as they happened and immediately afterward as opposed to describing past events, any reasonable listener would realize that the victim was facing an ongoing emergency, the questions asked and answered were relevant to the resolution of the ongoing emergency, and the victim gave frantic answers in an environment that was not tranquil or safe. *Id.* In sum, the victim in *Davis* "simply was not acting as a *witness*; she was not *testifying*." *Id.* at 2277.

Conversely, in evaluating *Hammon*, the Court found that Amy's oral statements and those in the affidavit were testimonial. *Id.* at 2278. In *Hammon*, as in *Crawford*, there was no ongoing emergency, there was no immediate threat to Amy or anyone else, and the purpose of the officers' questioning was to determine what had happened at some point in the past. *Id.* According to the Court, "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime . . . ." *Id.* In comparing the statements in *Hammon* to those in *Crawford*, the Court found that:

> Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Id.* The Court also noted:

> Although we necessarily reject the Indiana Supreme Court's implication that virtually any "initial inquiries" at the crime scene will not be testimonial, we do not hold the opposite—that no questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that officers called to investigate need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim. Such exigencies may often mean that "initial inquiries" produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial.

*Id.* at 2279 (italics, brackets, quotations and citations omitted).

In the wake of *Crawford* and *Davis*, we are left with a two-step analysis for determining whether an unavailable declarant's statements may be admitted at trial. First, it must be determined whether the statements at issue are testimonial under the *Crawford* and *Davis* criteria. If the statements are testimonial, then it must be determined whether the declarant is, in fact, unavailable, and whether there has been a prior opportunity to cross-examine, or whether the statements are admissible for some reason other than their truth. If the statements are not testimonial, the second step is to determine if the statements are admissible under *Roberts*.

With the above framework of *Crawford* and *Davis* in mind, we turn to the issue presented. Whether a statement is testimonial under *Crawford* and *Davis* is a legal conclusion which is determined by an objective analysis of the primary purpose of the interrogation which produced the disputed statement. *Davis*, 126 S. Ct. at 2273. Thus, although we defer to the trial court's determination of historical facts, we review its legal conclusion that Mrs. Ayer's statements were nontestimonial *de novo*. *See State v. Allen*, 150 N.H. 290, 292 (2003).

During trial, the defendant objected to Officer Matthews' testimony about Mrs. Ayer's declarations that "He had said that morning that he was going to shoot him," and "he'd been sitting across the street in his truck all morning waiting for him." Although the trial court did not have the benefit of *Davis*, it ruled that Mrs. Ayer's statements were not testimonial and thus not subject to *Crawford*. The trial court also found that the statements were admissible hearsay because they qualified as excited

utterances. We agree with the trial court that the statements were not testimonial and were otherwise admissible.

Because the declarant, Mrs. Ayer, was not the victim of the charged crime, we note that *Davis* is not precisely on point. However, it is sufficiently analogous to inform our analysis. As quoted above:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 126 S. Ct. at 2273. For the purpose of resolving this matter, we assume, without deciding, that by approaching Mrs. Ayer, Officer Matthews "interrogated" her, as the term is used in *Crawford*. *Crawford*, 541 U.S. at 53 n. 4 ("We use the term 'interrogation' in its colloquial, rather than any technical legal, sense."). Therefore, the relevant inquiry under *Davis* is whether the primary purpose of this interrogation was to enable police assistance to meet an ongoing emergency.

At the point that Matthews' interrogation began, he knew only that a shooting had occurred just moments before. He did not know whether the perpetrator was still in the immediate area or whether he would return to the area. Nor did he know whether the perpetrator was armed, or whether any potential witnesses or other members of the public were or would become targets. In short, Matthews did not know anything about the perpetrator that would indicate whether the violence had ended or whether it might continue there or elsewhere. Thus, obtaining information about the perpetrator would enable Officer Matthews to address an existing threat to his safety and the safety of others.

Furthermore, it was in a chaotic, non-tranquil setting filled with police, medical personnel and other bystanders, that Matthews approached a woman who was, like the victim in *Davis*, distraught, crying and hysterical, and who might have seen the shooting or might know the whereabouts of the perpetrator. Without any prompting, Mrs. Ayer offered the statements objected to by the defendant and then gave information about the perpetrator, including the fact that he had continued access to firearms. Here, as in *Davis*, Matthews' interrogation, objectively viewed, was primarily for the purpose of resolving an ongoing emergency.

■ The information Matthews obtained permitted him to know with whom he was dealing so that he could assess the situation, the threat to his safety, and the possible danger to other potential victims. *See Davis*, 126 S. Ct. at 2279. His initial inquiries thus resulted in the provision of information that enabled officers immediately to end a threatening situation. *Id.* As such, they were the type of initial inquiries that the Supreme Court identified as likely to produce nontestimonial statements. *Id.* Under these facts, we hold that the circumstances objectively indicate that the primary purpose of Matthews' interrogation was to enable police assistance to meet an ongoing emergency and, therefore, Mrs. Ayer's initial statements were not testimonial as defined in *Crawford* and *Davis*.

The defendant argues that the "ongoing emergency" language of *Davis* ought to be read narrowly. He contends that because Rowland had been shot and the gunman had fled, the emergency had abated and the police were primarily investigating past events. We do not read *Davis* so narrowly. Viewed objectively, as required by *Davis*, the interrogator knew that an armed assailant, who had just shot an unarmed individual in public in broad daylight, was loose, and could have remained in the immediate vicinity or could have gone elsewhere in search of other victims. The emergency created by the shooting had not necessarily ended merely because more shots had not yet been fired. *See State v. Camarena*, 145 P.3d 267, 275 (Or. Ct. App. 2006) (although defendant had left the scene of an assault, the fact that he could easily return meant that the emergency had not ended); *State v. Alvarez*, 143 P.3d 668, 674 (Ariz. Ct. App. 2006) ("Although the criminal activity that resulted in [the victim's] injuries and the ensuing charges against [the defendant] had ended, the emergency that those events set in motion was very much ongoing."). We do not believe that under these circumstances—when mere minutes had passed since the public shooting of an unarmed man by an unknown, at-large assailant—any rational police officer would believe that the emergency had subsided and that the *primary* concern would be to interrogate persons to obtain information potentially relevant to a future prosecution. *Davis*, 126 S. Ct. at 2273.

Alternatively, the defendant invites us to admit only Mrs. Ayer's statements of identification as relevant to resolving an ongoing emergency, but to exclude all other statements as testimonial. We decline the defendant's invitation. It is true that "a conversation which begins as an interrogation to determine the need for emergency assistance [can] ... evolve into testimonial statements, *once that purpose has been achieved*," *id.* at 2277 (quotations and citation omitted) (emphasis added), and that therefore a single conversation may have portions subject to *Crawford's* requirements and portions that are not. However, that analysis is not

applicable here. Mrs. Ayer's disputed statements were made prior to any determination regarding the need for emergency assistance or the degree of danger presented by the circumstances. Therefore, the purpose of determining the need for emergency assistance had not yet been achieved and the interrogation had not evolved into the collection of testimonial statements. *See Alvarez* 143 P.3d at 674 ("The Confrontation Clause does not prohibit questioning when, as here, its purpose, viewed objectively, is to ascertain if there is an ongoing emergency." (quotation omitted)).

For the above reasons, we hold that Mrs. Ayer's statements were not testimonial under *Crawford* and *Davis* and that their admission did not, therefore, violate the defendant's rights under the Federal Constitution. Additionally, while the defendant argued during trial that Mrs. Ayer's statements were testimonial and thus barred by *Crawford,* he did not contend that the statements were barred by the Rules of Evidence or *Roberts*. Accordingly, as the admissibility of Mrs. Ayer's statements under *Roberts* and the Rules of Evidence was not raised before the trial court, we do not address it. *See State v. Blackmer,* 149 N.H. 47, 49 (2003).

Regarding the defendant's State constitutional claims, we have traditionally applied *Roberts* to Confrontation Clause challenges under the State Constitution. *See, e.g., State v. Cook,* 135 N.H. 655, 661-62 (1992). As noted, the defendant has not argued that Mrs. Ayer's statements were barred by *Roberts;* thus we do not address the admissibility of her statements under the *Roberts* standard. *Blackmer,* 149 N.H. at 49. To the extent the defendant argues that *Crawford* applies to claims under the State Constitution, we need not decide the issue because, even assuming *Crawford* applies, for the reasons set out above we would not reach a different result. Accordingly, we conclude that admitting Mrs. Ayer's statements did not violate the defendant's rights under Part I, Article 15 of the New Hampshire Constitution.

## II. Evidence of Weapons and Ammunition in the Defendant's Truck

The defendant next argues that the trial court erred in allowing the State to introduce evidence of firearms, weapons and ammunition, not used in the charged crime, but seized from his truck. He contends that the seized items should not have been admitted because they were: (1) not used in the commission of the charged crime; (2) irrelevant and highly prejudicial; (3) inadmissible under New Hampshire Rules of Evidence 404(b) and 403; and (4) barred as a matter of due process under the New Hampshire and United States Constitutions.

As to the first issue, the State acknowledged that the items seized were not used in the charged crime. The trial court found the presence of

weapons and ammunition in the defendant's truck relevant to the issue of the defendant's intent, irrespective of their use in the charged crime. "Generally, we accord considerable deference to a trial court's evidentiary rulings and will only intervene when they demonstrate an unsustainable exercise of discretion." *State v. Belton*, 150 N.H. 741, 743 (2004). "Unless a party establishes that such a ruling was clearly untenable or unreasonable to the prejudice of the party's case, it will not be disturbed." *Id.* We agree that the weapons were relevant to an issue in dispute, and conclude that the fact that the items were not used in the charged crime, without more, does not establish that the trial court's ruling was untenable or unreasonable.

The defendant next argues that that evidence was highly prejudicial, irrelevant and barred under Rules 403 and 404(b). Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." N.H. R. Ev. 404(b). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Evidence is admissible under Rule 404(b) when it is relevant for a purpose other than proving the defendant's character or disposition, there is clear proof that the defendant committed the act, and the probative value of the evidence is not substantially outweighed by its prejudice to the defendant. *State v. Watkins*, 148 N.H. 760, 767 (2002). Because the first and third prongs of this test entail determinations of relevance and probative value versus prejudice, we need not separately address the defendant's other arguments. *Id.*

 ■ Prior to the defendant's first trial, the trial court ruled that evidence of the weapons was relevant to the issue of the defendant's premeditation and deliberation because the amount of weaponry could support the theory that the defendant had planned and prepared for this violent act. The trial court affirmed that ruling prior to the second trial. "Relevant evidence need only have a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (quotation omitted). Evidence of numerous weapons in the defendant's truck could tend to show that he had planned and prepared to stage some type of violent act. Accordingly, the record supports the trial court's ruling that the presence of weapons in the defendant's truck was relevant for a purpose other than showing the defendant's character or disposition.

Turning to the clear proof requirement, it is satisfied when the State presents evidence firmly establishing that the defendant, and not some

other person, committed the prior act. *State v. Berry*, 148 N.H. 88, 92 (2002). The record reveals that the defendant did not below, and does not now, argue that the State did not meet its burden under the clear proof requirement. Thus, the issue is not before us.

Regarding the third factor, the record supports the finding that the probative value of the evidence is not substantially outweighed by the prejudice to the defendant. As noted by the trial court, the presence of numerous weapons in the defendant's truck was probative of his intent, plan or preparation to commit a violent act. Further, because the issue of the defendant's intent was central to the trial of this matter, the probative value was significant. Conversely, the prejudicial impact to the defendant was limited. The trial court admitted the evidence for the sole purpose of determining the defendant's intent and so instructed the jury. Because the jury is presumed to follow the instructions given by the trial court, *see State v. Littlefield*, 152 N.H. 331, 348 (2005), any prejudice caused by the admission of the evidence of the firearms and ammunition was slight. In sum, because the record supports the admission of the evidence of the weapons and ammunition in the defendant's truck under Rule 404(b), we conclude that the trial court did not unsustainably exercise its discretion.

Lastly, the defendant contends that admitting the evidence of weapons and ammunition violated his due process rights under the New Hampshire and Federal Constitutions. The defendant, however, does not explain how his rights were violated. He argues only in conclusory terms that "the evidence should have been excluded as a matter of due process." Because, in the realm of appellate review, a mere laundry list of complaints regarding adverse rulings by the trial court, without developed legal argument, is insufficient to warrant judicial review, *see Blackmer*, 149 N.H. at 49, we decline to address the defendant's constitutional argument.

### III. Lesser Offenses and Proposed Defenses

Next, the defendant argues that the trial court erred in refusing to instruct the jury on the lesser offenses of reckless manslaughter under RSA 630:2, I(b) (1996), and provocation manslaughter under RSA 630:2, I(a) (1996), and on the defense of a person justification under RSA 627:4 (1996). The defendant also argues that he was improperly denied the right to present the defense of "Right to Revolution" under the New Hampshire Constitution.

Prior to trial, the defendant filed a notice of defense stating that he might raise the defense of physical force in defense of a person under RSA 627:4, and requested that if he did raise the defense, the appropriate jury instruction be given. According to the defendant, he was justified in using physical force to protect his son from being illegally removed from his

home. More specifically, the defendant contended that he was justified in using deadly force to protect his son from being kidnapped by DCYF or others working on its behalf. The trial court, ruling on the State's motion to strike following a hearing, found that no evidence or facts were presented to support the defendant's claimed defense and therefore no instruction would be given.

■ "Although the scope and wording of jury instructions is generally within the sound discretion of the trial court, the court must grant a defendant's requested jury instruction on a specific defense if there is some evidence to support a rational finding in favor of that defense." *State v. Haycock*, 146 N.H. 5, 9 (2001) (quotation omitted). "By 'some evidence,' we mean that there must be more than a minutia or scintilla of evidence." *Id.* (quotation omitted). "Where, however, there is simply no evidentiary basis to support the theory of the requested jury instruction, the party is not entitled to such an instruction, and the trial court may properly deny the party's request." *State v. Hast*, 133 N.H. 747, 749 (1990). "We will review the trial court's decision not to give a jury instruction for an unsustainable exercise of discretion." *State v. Chen*, 148 N.H. 565, 569 (2002).

■ RSA 627:4 provides that a person is justified in using deadly force on another person when he reasonably believes that the other person is committing or about to commit kidnapping. RSA 627:4, II(c). A person is guilty of kidnapping if he knowingly confines another under his control with a purpose to:

(a) Hold him for ransom or as a hostage; or
(b) Avoid apprehension by a law enforcement official; or
(c) Terrorize him or some other person; or
(d) Commit an offense against him.

RSA 633:1, I (1996). The trial court found that although the defendant had shown frustration and dissatisfaction with state actions relative to his son, the defendant did not present facts that could support his defense. Having reviewed the record, we agree that the defendant failed to present some evidence to support a rational finding in favor of the defense of physical force in defense of a person. While the defendant presented evidence of his alleged mistreatment by DCYF, other agencies, and their representatives, there is simply no evidence that Rowland, DCYF, or any other person or entity had any intent to kidnap the defendant's son or that the defendant reasonably believed they had such intent. Accordingly, we find no error in the trial court's decision not to give the requested instruction.

Regarding the defendant's claim that he was entitled to an instruction regarding provocation manslaughter under RSA 630:2, I(a), the trial court found that the evidence presented did not support it. Under RSA 630:2, I(a), a person is guilty of manslaughter, and not murder, when he causes the death of another while under extreme mental or emotional disturbance caused by extreme provocation. "It is generally recognized that provocation is adequate to reduce a homicide from murder to manslaughter only if it would cause a reasonable person to kill another out of passion." *State v. Smith*, 123 N.H. 46, 48 (1983). However, "a lawful act cannot provide sufficient provocation to support a finding of manslaughter." *Id.* at 49.

▉ Here, Rowland had been assigned to the defendant's family's case following a referral from DCYF and had gone to meet with the defendant pursuant to a scheduled visit, which he would not abandon despite the defendant's request. According to the defendant, his long running problems with DCYF, coupled with Rowland's refusal to leave, constituted sufficient provocation to justify a manslaughter instruction. Rowland, however, was engaged in a lawful act when he refused to leave, and a lawful act cannot provide sufficient provocation to support a finding of manslaughter. *See id.* Accordingly, the trial court did not err in declining to give the requested instruction.

Finally, with regard to the defendant's claims that he ought to have been given the opportunity to present defenses of reckless manslaughter under RSA 630:2, I(b) and the "Right to Revolution" under the New Hampshire Constitution, those claims were not raised before the trial court. Accordingly, we do not address them. *See Blackmer*, 149 N.H. at 48.

*IV. Appointment of Counsel*

The defendant next argues that the trial court improperly appointed counsel to represent him when he had elected to proceed *pro se*. The defendant contends that he had the right to refuse counsel, that he did so, and that the trial court, nonetheless, appointed counsel to represent him. Therefore, the defendant argues, the trial court violated his rights under Part I, Articles 14 and 15 of the New Hampshire Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. We first address the defendant's claims under the State Constitution and cite federal opinions for guidance only. *See State v. Thomas*, 150 N.H. 327, 328 (2003). Because Part I, Article 14 of the New Hampshire Constitution does not bear on the defendant's right to self-representation, we do not consider it.

 "Both Part I, Article 15 of the State Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to self-representation and the right to counsel." *State v. Sweeney*, 151 N.H. 666, 670 (2005); *see also Faretta v. California*, 422 U.S. 806 (1975). "The two rights are mutually exclusive; the exercise of one right nullifies the other." *Sweeney*, 151 N.H. at 670. "To be effective, an assertion of the right to self-representation must be: (1) clear and unequivocal; (2) knowing, intelligent and voluntary; and (3) timely." *Id.*; *see also State v. Thomas*, 150 N.H. at 328-29.

The defendant argues that the trial court, in its December 29, 2003 order, "made it clear" and "finalized" that he was appearing *pro se*. Therefore, the defendant argues, the trial court erred in later appointing counsel to represent him. The State, in turn, contends that the defendant did not clearly and unequivocally assert the right to self-representation at any point and, therefore, the trial court was justified in appointing counsel. Based upon our review of the record, we agree that the defendant did not clearly and unequivocally assert the right to self-representation.

During a hearing in December 2003, the trial court asked the defendant whether he wished to proceed *pro se* or with counsel. Rather than choose, the defendant stated that his appointed counsel did not support filing various motions in the New Hampshire Supreme Court and would not aid him in various matters he had filed with the federal courts. The defendant requested a stay of his case until his other matters in the New Hampshire Supreme Court and the federal courts were resolved.

The defendant's counsel was appointed for the purpose of aiding him in his defense in superior court. The trial court ruled that matters outside superior court had no direct bearing on the defendant's case and that the case would not be stayed in order to facilitate the defendant's other actions. The trial court informed the defendant that regardless of any pending matters in other courts, his case would go forward unless stayed by the order of a higher court and the defendant needed to decide whether he would represent himself. The defendant made no choice.

Following the hearing, the trial court issued an order stating, in relevant part:

> Mr. Ayer has requested additional time to resolve the status of counsel issue. He was not prepared today to make a decision as to whether he will represent himself and appear *pro se* at the trial or whether he will have Attorney Guerriero and Attorney Nye be his fully appointed counsel for the trial. Accordingly, as the docket permits, a further thirty (30) minute status of counsel

> hearing shall be scheduled before me on or about February 1, 2004.
>
> ... Finally, until this Court otherwise rules with respect to legal representation in this case, I will view Mr. Ayer as appearing *pro se* in this matter.

The plain language of the trial court's order states that the defendant would be deemed *pro se* until the status of his counsel could be finally resolved at some later date because he was not prepared to make a decision at that time. Thus, contrary to the defendant's claim, the trial court did not rule that he would appear *pro se* for the duration of the trial, but only that he would be deemed *pro se* until the status of counsel was resolved. Nor did the trial court state that the defendant had clearly and unequivocally invoked the right to self-representation, but only that he was not prepared to make a choice at the time of the hearing.

At the next status of counsel hearing, the trial court again inquired whether the defendant would accept appointed counsel or whether he would represent himself. Again, the defendant would not choose, but only objected to making a choice. The defendant also requested that a specific attorney from Massachusetts be appointed if the trial court insisted on appointing counsel for him.

The trial court correctly declined the defendant's request for the appointment of a specific attorney. *See State v. Mikolyski*, 121 N.H. 116, 117 (1981); *see also* 1 R. MCNAMARA, NEW HAMPSHIRE PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 18.12, at 395 (2003) ("Although the indigent defendant has a right to the effective assistance of counsel, he does not have a right to the assistance of any particular counsel."). Further, according to the trial court's order following the hearing:

> Approximately seven times I requested from Mr. Ayer a decision as to whether he wished to proceed pro se or have counsel appointed for him. Mr. Ayer made it very clear that he was not invoking his right to proceed pro se. He repeatedly declined to make a decision and stated that he was not about to "give up one right for another." ... Mr. Ayer declined to make a decision as to whether he would accept the appointment of counsel or proceed pro se. ... Accordingly, I appointed Attorney Julia Nye and Attorney Richard Guerriero as his trial counsel.

The record supports the trial court's characterization of the proceedings and the defendant's failure to choose whether he would be represented by counsel or whether he would proceed *pro se*. Accordingly, we uphold the trial court's determination that the defendant did not clearly and

unequivocally invoke his right to self-representation and we likewise uphold its decision to appoint counsel for the defendant. As the defendant's rights under the New Hampshire Constitution were not violated, and as the Federal Constitution does not give the defendant any greater protection, we reach the same conclusion under the Federal Constitution. *Thomas*, 150 N.H. at 328-30; *see Faretta*, 422 U.S. at 834-35.

## V. Right to Counsel During Booking and Unrecorded Interview

Next, the defendant contends that the trial court erred in failing to find that he had invoked his right to counsel during booking and during an unrecorded interview. According to the defendant, because the trial court did not find that he had invoked his right to counsel, it improperly denied portions of his motions to suppress in violation of Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.

We first address the defendant's claim under the State Constitution and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231 (1983). "Both the United States Supreme Court and this court have developed procedural protections to be adhered to during custodial interrogations." *State v. Plch*, 149 N.H. 608, 613 (2003). "Accordingly, before interrogating a person in custody, the police must inform him that he has a right to remain silent, that anything he says can and will be used against him, and that he has a right to counsel." *Id.* (quotation omitted). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* (quotation omitted). "While we review a trial court's finding concerning which words a defendant used to invoke the right to counsel under the clearly erroneous standard, whether those words constitute an invocation of the right to counsel is a question of law, which we review *de novo*." *State v. Grant-Chase*, 140 N.H. 264, 267 (1995) (citations omitted), *cert. denied*, 517 U.S. 1140 (1996).

In ruling on the defendant's motion to suppress, the trial court found that the video tape of the booking procedure and the testimony of the booking officer, Officer Barry Fenton, demonstrated that the defendant did not request counsel during the booking process. Upon review of the record, we agree that the defendant did not use any words that invoked the right to counsel during booking. Therefore, the trial court's finding was not clearly erroneous.

Regarding the defendant's contention that he requested counsel during an unrecorded interview, the trial court received conflicting testimony: two police officers testified that the defendant did not use any

words that would invoke the right to counsel, while the defendant testified that he requested an attorney. "The weight to be given testimony depends on the credibility of the witnesses, and the credibility of witnesses is for the trial court to determine." *State v. Gourlay*, 148 N.H. 75, 78 (2002) (quotation omitted). Since we cannot say that no reasonable person would have reached the same decision in light of the conflicting testimony, we defer to the finding of the trial court. *See id.* Accordingly, we hold that the defendant's right to counsel under the State Constitution was not violated either during booking or during the unrecorded interview. Further, because the Federal Constitution does not provide any greater protection than does the State Constitution, we reach the same result under the Federal Constitution. *Plch*, 149 N.H. at 620; *see United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994).

## VI. Statement to Nashua Police

Next, the defendant argues in his notice of appeal that the trial court erred in only partially suppressing the results of his interrogation at the Nashua Police Department. The defendant, however, has not briefed the issue, and thus it is deemed waived. *See State v. Mountjoy*, 142 N.H. 648, 652 (1998).

## VII. Motions to Suppress—Unlawfully Obtained Statements

Next, the defendant argues that the trial court erred in denying his motions to suppress various items allegedly seized from his truck as the result of unlawfully obtained statements. Specifically, the defendant contends that paragraphs 4 and 9 of the affidavit submitted with the application for a search warrant rely on statements he gave in violation of his rights. He argues that those statements should be stricken from the affidavit and that without those statements, the affidavit is insufficient to establish probable cause to issue a warrant for the search of his truck.

In ruling on the defendant's motion to suppress the items seized from his truck, the trial court found that the police conducted a valid consensual search. According to the trial court, there was no evidence that the defendant was scared or intimidated or that the police used any improper tactics when obtaining consent. Therefore, the trial court found that the defendant had freely, knowingly and voluntarily consented to the search.

"A voluntary consent free of duress and coercion is a recognized exception to the need of both a warrant and probable cause." *State v. Johnston*, 150 N.H. 448, 453 (2004) (quotation omitted). "The burden is on the State to prove, by a preponderance of the evidence, that the consent was free, knowing and voluntary." *Id.* "The validity of the consent is

determined by examining the totality of the circumstances." *Id.* "We will disturb the trial court's finding of consent only if it is not supported by the record." *Id.*

█ The trial court heard from two police officers who testified that the defendant consented to a search of his home and vehicle, and that he freely signed a form indicating his consent. Also, the trial court reviewed a video taped interview with the defendant during which he signed a consent to search form without objection. Accordingly, the trial court's finding that the defendant consented to the search of his vehicle is supported by the record and will not be disturbed. Because the search of the defendant's vehicle was conducted with the consent of the defendant, we need not address his argument regarding the sufficiency of the search warrant affidavit.

*VIII. Testimony of Norman Bleau*

Finally, in his brief the defendant argues that the trial court erred in admitting the testimony of Norman Bleau. This issue, however was not raised in the defendant's notice of appeal; nor did he file a motion to add a question. *See* Sup. Ct. R. 16(b). Because an argument that is not raised in a party's notice of appeal is not preserved for appellate review, *Blackmer*, 149 N.H. at 49, we do not address the issue of Mr. Bleau's testimony.

*Affirmed.*

Brock, C.J., and Horton, J., retired supreme court justices, specially assigned under RSA 490:3, concurred; Murphy, C.J., and Hollman, J., retired superior court justices, specially assigned under RSA 490:3, concurred.